SIGMUND LEWANDOWSKI, LUCILLE ACHTZEHN, WILLIAM VAIL AND JOSEPH KASSAKIAN, PETITIONERS-RESPONDENTS, v. BROOKWOOD MUSCONETCONG RIVER PROPERTY OWNERS' ASSOCIATION, A CORPORATION NOT FOR PECUNIARY PROFIT ORGANIZED UNDER TITLE 15 OF THE LAWS OF NEW JERSEY, AND MAURICE C. GENNERT, RESPONDENTS-APPELLANTS.

Argued April 2, 1962—Decided June 4, 1962.

434

*Mr. Howard T. Rosen* argued the cause for respondents-appellants.

*Mr. Ashley Goodman* argued the cause for petitioners-respondents (*Messrs. Goodman & Goodman,* attorneys; *Mr. Ashley Goodman,* on the brief).

*Mr. Richard F. Green,* Deputy Attorney General, argued the cause for respondent Board of Public Utility Commissioners (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Richard F. Green,* on the brief).

The opinion of the court was delivered by
PROCTOR, J. The Brookwood Musconetcong River Property Owners' Association (Association) and Maurice C.

Gennert appeal from an order of the Board of Public Utility Commissioners (Board), in which the Board found that the Association operates the water system which serves Brookwood Musconetcong River Estates and that the Association is a public utility within the meaning of *N. J. S. A.* 48:2–13 and therefore subject to the jurisdiction of the Board.

The petitioners, Sigmund Lewandowski, Lucille Achtzehn, William Vail and Joseph Kassakian, residents of Brookwood Musconetcong River Estates who depend upon the water system for their water supply, had petitioned the Board to take jurisdiction and exercise its regulatory power over the operators of the water system. They named as respondents Brookwood Musconetcong River Corporation, Bernard J. Cunnane, John W. Caspersen, Olaus Caspersen, Herbert P. Cutler, Willis H. Sherred, John R. Knox, Brookwood Musconetcong River Property Owners' Association and Maurice C. Gennert. The respondents' motion to dismiss for lack of jurisdiction was denied by the Board. They then moved in the Appellate Division for leave to appeal. Without granting the motion, that tribunal remanded the cause to the Board "to make findings of fact and conclusions of law on the issue of jurisdiction." On the remand, the Board found it had jurisdiction and ordered the Association and its Trustees to comply with the Board's rules and regulations, but dismissed the petition as to all other named respondents. Since Maurice C. Gennert was the only respondent who was also a Trustee, he and the Association remained as the sole respondents. They again moved in the Appellate Division for leave to prosecute an interlocutory appeal on the issue of jurisdiction, which motion was granted. The petitioners have not cross-appealed as to the dismissal of the other respondents. While the appeal was pending in the Appellate Division, we certified the cause.

In 1953 Brookwood Musconetcong River Corporation (Developer) acquired a tract of land in Sussex County, the greater part of which was situated in the Borough of Stan-

hope, the remainder in Byram Township. A subdivision map dated July 27, 1953, filed in the County Clerk's office, delineated paper streets and indicated the tract contained about 1,000 lots. The Developer's object was to sell the lots to individuals who would erect single-family dwellings thereon. Its promotional efforts were directed to the general public and its advertisements included the fact that "water mains" were provided.

As part of its selling plan the Developer, on October 7, 1953, organized a nonprofit association under *R. S.* 15:1–1 *et seq.* According to its certificate of incorporation, the Association was formed "to insure the present and future character and welfare of the development * * * and such other lands adjoining that may be acquired from time to time and added to the development by [Developer], and to promote the welfare, social, intellectual and recreational interests of its members; * * * to provide for utility services * * *" The certificate further provided that "The business of the corporation shall be conducted by the Trustees who shall be known as the Board of Governors * * *" and names to the initial Board five Trustees who were closely associated with the Developer: John Caspersen, President and Director of the Developer, Olaus W. Caspersen, a Director of the Developer, Herbert P. Cutler, sales agent for the Developer, and Willis H. Sherred and John R. Knox, attorneys for the Developer. The bylaws of the Association provided for three classes of membership: Original active, active and honorary. The original active membership was the Developer or its transferee as developer; the active membership consisted of the owners of lots purchased from the Developer and who were approved by the Board of Governors; honorary membership was reserved for persons of outstanding accomplishments regardless of residence. The bylaws gave the "original active membership" the power to elect a majority of the Board of Governors so long as that class of membership continued to exist. Since the Developer or its transferee constituted the

entire "original active membership" this arrangement gave them control of the Board of Governors until such time as they no longer had an interest in the development. The bylaws, like the certificate, permitted an enlargement of the scope of the Association to provide for the character and welfare of other lands subsequently acquired by the Developer. The bylaws included among the purposes of the Association: "To * * * acquire, regulate and control * * * water * * * facilities * * *"; and "To provide for utility services."

On the same day (October 7, 1953), the Developer entered into a contract with the Association in which the parties agreed that: The Developer would construct and install a water supply system; the Developer would supply water either by obtaining it from the Borough of Stanhope or by drilling independent wells; the Association authorized the transfer of the water system to the Borough of Stanhope to assure a supply of water; the Association would pay the total cost of construction, installation and maintenance of the water supply system; the individual lot owners would pay for water consumed at the rates established by their supplier, *i. e.,* the Borough of Stanhope or the Association; the Developer could cease construction of the system if, in its sole judgment, the plan became financially hazardous; and if the Developer ceased construction the Association would reimburse it for all expenses incurred.

On September 27, 1954 the Developer entered into a contract with the Borough of Stanhope whereby the Developer agreed to construct its mains in accordance with municipal specifications and to lay pipes of a certain size in named streets in order to hook into the borough's water system. Stanhope agreed to furnish water at "customary rates" to that part of the development which was located within the borough. The Developer further agreed to turn over the system to Stanhope within three years.

On October 14, 1954 the Developer, as settlor, executed a deed of trust which was never recorded, but which was

"accepted and approved" by the Association through its President, Herbert P. Cutler. The Developer named Sherred, Cutler and Knox as Trustees of the water system, gave them the power to designate successors in the event of their retirement, and conveyed to them title to the system as it existed along with "any and all additions thereto which may be hereafter constructed," excepting therefrom the portion of the system described in the agreement between the Developer and the Borough of Stanhope. In the event that portion was not conveyed, title to the entire system would pass to the Trustees. The trust instrument further provided that: The Developer is to construct a water system "in accordance with its sole judgment"; the Developer's statement of its expenses shall be "conclusive evidence" of the sum due it; all maintenance expenses shall be paid from the Association's funds; the water charges made by the Trustees shall be sufficient to keep the trust on a sound financial basis and provide funds to "fully reimburse Settlor for its costs with interest by January 1, 1970"; the trust shall continue until the Developer has been fully paid; after payment the Trustees shall convey the system to the Association; and if the trust fails the system shall be sold by the Trustees at public sale and the funds realized shall be used to reimburse the Developer and any surplus paid to the Association.

The Developer proceeded to install 24,000 feet of water mains in streets throughout the development. It also constructed a well with appropriate equipment. Those members of the Association whose lots were located within the Borough of Stanhope were supplied water from that borough's system, while the lot owners situated within Byram Township were supplied from the Developer-constructed well.

In furtherance of a proposed annexation by Byram Township of that part of the development located within Stanhope, the Developer and Stanhope entered into an agreement on September 30, 1957, cancelling the contract of September 27, 1954. When Byram Township annexed the Stanhope

lots, the Trustees of the water system and the Association entered into a contract with the township on November 29, 1957, in which the parties agreed that the township would "not now or at any time in the future" be charged "any fee, rent or franchise for the uses and maintenance of said water system and particularly the fire hydrants located within said development." They further agreed the "Trustees shall make no application to the Public Utilities Commission of the State of New Jersey to have Byram charged for the use of fire hydrants or any part of the water system and in the event said water system is deemed to be a public utility no application or charge shall be made to Byram for hydrants or any part of said water system."

On September 29, 1959 the Developer conveyed most of the unsold lots in the tract to Maurice C. Gennert, who then began to advertise and sell them. On July 26, 1960, the original Trustees of the water System, Sherred, Cutler and Knox, resigned and designated as their successors Maurice C. Gennert, Margaret Gennert and Margaret Chamberlain.

Although the water system had been constructed and operated for at least four years, application to the State Department of Health for permission to construct and operate it was first made on March 30, 1959. Permission was granted on November 21, 1960.

Potential lot owners were required to apply for membership in the Association at the same time they executed their contracts of purchase. The membership applications bound the purchasers to pay the Association three dollars per front foot for the installation of water mains. (Earlier buyers in the development were charged one dollar per front foot.) The deeds uniformly provided that purchasers would maintain their membership in the Association and abide by its bylaws. Since the bylaws gave the Association the right to provide for utility services and to maintain water facilities, lot purchasers thus bound themselves to pay the charges fixed by the Association for water service. Though the

deeds limited membership in the Association to owners of land in the development, they provided for an enlargement of the membership in the event the Developer expanded the development by acquiring adjoining lands.

The petitioners, purchasers of land from the Developer, filed a petition with the Board in which they complained of excessive charges and of defects in the water system. They alleged the respondents had attempted "by ruse, camouflage and manipulations" to deprive the Board of its jurisdiction and asserted the Developer stood to collect $93,000, $66,000 of which had already been paid, for a water plant which could be duplicated for not more than $5,000. They prayed the Board take jurisdiction and compel the respondents to account for the funds improperly obtained and order them to provide a safe and adequate supply of water at reasonable rates.

In their answer, the respondents denied any wrongdoing and asserted *inter alia* the Board was without jurisdiction because neither the Association nor any of the other respondents constituted a public utility. Pursuant to the Appellate Division's order on remand, the hearing before the Board was confined to the issue of the Board's jurisdiction, all other matters being held in abeyance pending final resolution of that issue.

At the hearing John Knox, attorney for the Developer, testified that between 350 and 400 individuals had purhcased lots from the Developer. Of this number, 48 were presently served with water by the Association, and charged $24 per year which was used to help reimburse the Developer for the initial cost of the water system. The balance of the purchasers owned lots upon which homes had not as yet been erected. Mr. Knox stated that no one could purchase a lot from the Developer without becoming a member of the Association. He testified that a few residents in the area were not members of the Association because they had not purchased their land from the Developer. He stated they were denied water from the Association's system, since all

water was reserved for the exclusive use of Association members. Mr. Knox also testified that the Developer and persons associated with it were the only members of the Association up until 1956 or 1957 when the first Association meeting involving individual property owners was held. He testified the purpose of executing the deed of trust over the water system "was primarily as a security device to assure repayment of the initial cost to the developer," and that the Developer was not involved in the actual operation of the system.

Mr. Albert DiRenzo testified he installed water hydrants and about 24,000 feet of water mains in the streets of the subdivision between 1954 and 1957. He stated he did not install the well system but merely hooked the mains into the well house. He also testified that he connected the system with the Stanhope water supply. He installed his lines in accordance with the subdivision map filed in the Sussex County Clerk's office. However, he said his work was never examined by Stanhope, Byram or the State Department of Health, and that he never obtained any street opening permits. Mr. DiRenzo further testified that he also severed the connection with the Stanhope system and that presently the water system was entirely self-contained, all of the water coming from the well in the system.

The Board, after considering the documents described above, and the testimony elicited at the hearing, found *inter alia:*

"2. By Deed of Trust, a water system is held for the benefit of the Association.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

4. The membership restrictions are so broad that this association cannot be construed a private, limited-membership association.

5. The water system is operated, managed and controlled by the Association.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

8. The streets wherein the above-mentioned water mains are located have been dedicated to the public use.

9. Municipal consents to the operation of this water system and the use of the streets for that purpose is implied in agreements

recognizing the existence of this water supply system by the municipalities.

10. The present and future Trustees of the Association are subject to the jurisdiction of the Board pursuant to *N. J. S. A.* 48:2–13 in that, by virtue of their legal title to the system, they *own* the system and in that, by the terms of the trust deed, they may be or become entitled to exercise more than a nominal control thereof.

11. Brookwood Musconetcong River Property Owners' Association is a public utility subject to the jurisdiction of this Board, pursuant to *N. J. S. A.* 48:2–13."

Accordingly, the Board ordered the "Association and its Trustees to comply with the applicable provisions of *N. J. S. A.* 48, relating to water utilities and public utilities in general, and with the Board's Rules and Regulations relating to the operations of water utilities. Furthermore, the Board HEREBY DISMISSES the petition as it relates to all other Respondents named therein." The Association and Maurice C. Gennert appeal from that part of the order which held them subject to the Board's jurisdiction.

The Board's jurisdiction is governed by *N. J. S. A.* 48:2–13, which in pertinent part provides:

"The board [Board of Public Utility Commissioners] shall have general supervision and regulation of and jurisdiction and control over all public utilities as hereinafter in this section defined and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this title.

The term 'public utility' shall include every individual, copartnership, association, corporation * * * that now or thereafter may own, operate, manage or control within this state any * * * water * * * plant or equipment for public use, under privileges granted or hereafter to be granted by this state or by any political subdivision thereof."

The primary issue on this appeal is whether the Association comes within the above definition of a "public utility."

The statute requires the existence of two conditions in order to bring a water supplier within the definition, *i. e.,* (1) that it owns, operates, manages or controls a water system for public use, and (2) that it does this under

privileges granted by the State or any of its political sub-divisions.

The appellants contend the water system here is not "for public use" because there is no undertaking to serve the public at large, the service being exclusively for the benefit of a group of neighbors who have banded together for their own welfare; and the mere possibility of an expansion in the size of the development by a subsequent acquisition of adjacent lands would not alter the character of the use. They also argue that the Board is without jurisdiction because no franchise to operate this water system has been awarded. The appellants further contend that "privileges" cannot be spelled out from: the certificate of incorporation; the State Board of Health permit; or the fact that water mains have been installed in streets dedicated to public use. As to the last point, they assert that in any event, the dedicated streets were never accepted by Stanhope or Byram, nor did these municipalities consent to the mains being placed in the streets. They also argue the Board has no jurisdiction over nonprofit associations organized under R. S. 15:1–1 et seq. Finally, they point out that Maurice C. Gennert was the only one of the three Trustees who was before the Board and assert that therefore "The Board erred in determining that three co-trustees are a public utility when two of the trustees are not parties to the action and were not served with process or otherwise notified of the suit."

The petitioners contend the Developer dominated the Association, that it conceived and utilized the Association as "part and parcel of a sales program." According to the petitioners, the Developer induced the general public to buy lots on the representation that water would be supplied from a central source, thus making the system "for public use." They assert the system operated under many govern-mental privileges including: the privilege to incorporate and provide utility service; the privilege to install a water system in the public streets; and the privilege to operate

with the approval of the State Department of Health. The petitioners also contend the Association and Maurice C. Gennert should be estopped from denying their status as a public utility because of the way in which the water system was established and operated. Finally, the petitioners argue that even though the Board did not have jurisdiction over two of the Trustees, it did have jurisdiction to make a factual determination as to the status of the water system.

The Attorney General, appearing for the Board, filed a separate brief in which he asserts many of the same reasons urged by the petitioners for finding the public use and governmental privileges essential to sustain the Board's jurisdiction. In reply to the argument that the Board's order is void because two of the three Trustees were not before it, the Attorney General points out that the order is not a final disposition of the cause and contends the Board can, at the subsequent proceedings, direct the petitioners to join the remaining Trustees as respondents if that proves necessary.

■ There is no merit to appellants' argument that the Board lacks jurisdiction because the Association is a non-profit corporation. We think *N. J. S. A.* 48:2–13 clearly includes such groups in the terms "association" and "corporation."

■ Whether a water system is operated "for public use" depends upon *the character and extent of the use* and not upon agreements or understandings between the supplier and those supplied. See *Van Dyke v. Geary,* 244 *U. S.* 39, 48, 37 *S. Ct.* 483, 61 *L. Ed.* 973, 982 (1917). If a water supplier diverts significant quantities from the State's natural resources for the ultimate use of a broad group of consumers, the system is operating for public use; and the fact that the supplier is under no obligation to supply the water diverted by it to the general public or any portion thereof is immaterial with respect to the jurisdiction of the Board. *East Jersey Water Co. v. Board of Public Utility Commissioners,* 98 *N. J.* 449 (*E. & A.* 1922). Appellants

do not dispute the fact they are diverting significant quantities of water for the use of the Association's members, but they contend that since membership in the Association is a prerequisite to obtaining water service, the group of consumers is confined, thereby excluding any notion that the service is "for public use." It is unnecessary for us to decide whether the Association's water system would be for private use if the users were in fact members of a restricted group since we are in accord with the Board's finding that they are not.

By contracting with the Developer, the Association created a water system for the benefit of its potential members, *i. e.*, future purchasers of lots from the Developer. These purchasers included not only prospective buyers of lots in the present development but also those who might buy lots in any adjoining property the Developer acquired. Indeed, when the Association was formed and the contract for the construction of the water system by the Developer executed, the membership of the Association did not include any consumers for whose benefit the water system was intended. At that time the Developer had not begun to sell its lots and the only members of the Association were the Developer and its agents. The Developer's subsequent sales campaign was directed to the public at large, and, as an inducement to prospective buyers, it represented that water service would be provided. It was impossible for any one to buy a lot without becoming a member of the Association. A prospective purchaser submitted an application for Association membership in which he agreed to maintain his membership, abide by its rules, pay the annual charges levied and pay a stipulated sum for the installation of water mains. Contemporaneously with receiving his deed a buyer became a member of the Association. At the time of the hearing the purchasers numbered 350 to 400 and unsold lots were still available to the public. An undertaking of this size with consumers being indeterminate from the outset cannot be classified as a project merely among neighbors and colored

by any private cast which might attach to such a group. The character of the use is clear, *i. e.,* to serve all members of the public who buy lots from the Developer. The extent of the use is equally clear, *i. e.,* an entire housing development is dependent upon the Association for a prime necessity of life. As the character and extent of the use make it public, we conclude the Association is operating a water system "for public use" within the meaning of *N. J. S. A.* 48:2–13.

█ The second jurisdictional requirement is that the operation of the water system be "under privileges * * * granted by this state or by any political subdivision thereof." *N. J. S. A.* 48:2–13. The appellants contend this requirement has not been met because the Association never obtained a franchise nor did it receive any express consents from Stanhope or Byram to install its water mains. We agree the Association does not hold a franchise and that it cannot exercise many of the powers reserved for a franchised utility. See *N. J. S. A.* 48:19–1 to 25; *R. S.* 58:6–1 to 5. However, *N. J. S. A.* 48:2–13 does not provide that the "privileges" must be franchises in order to make the water supplier subject to the jurisdiction of the Board. Compare *R. S.* 48:2–14. The requisite "privileges" may take various forms. *East Jersey Water Co. v. Board of Public Utility Commissioners, supra.* In that case the water company had no franchise. The court, in holding that the water company came within the jurisdiction of the Board of Public Utility Commissioners, found the statutory "privileges" from the company's charter granted under the General Corporation Act, *P. L.* 1876, *p.* 103, and from the State's acquiescence in the use of its waters by the company.

██ The Association has been granted several privileges from both the State and the municipalities of Stanhope and Byram. The streets in which the water mains were placed had been dedicated to the public by the filing of the map and the sale of lots by reference to the map prior to the installation of the system. Once this dedication occurred, the

public had an interest in the streets and neither the Developer nor the Association was free to proceed as if the streets were private property. See *Highway Holding Co. v. Yara Engineering Corp.*, 22 *N. J.* 119, 125–126 (1956); "Public Ownership of Land Through Dedication," 75 *Harv. L. Rev.* 1406 (1962). Since it installed and continuously uses water mains in the dedicated streets, an activity which a private citizen could not undertake without the consents of Stanhope and Byram, the Association cannot deny it was granted privileges from subdivisions of the State. Moreover, Stanhope, in its contract with the Developer, recognized and implicitly approved the laying and maintaining of the mains in the streets and thereby granted a privilege without which the water system could not have been operated by the Association. Byram did likewise in its contract with the Association and its Trustees. Though these municipal grants do not in themselves constitute franchises, it cannot be gainsaid that they satisfy the statutory requirement for "privileges." Additionally, the State Department of Health has granted the Trustees the permission necessary for the Association to operate the water system and supply water for potable purposes. *R. S.* 58:11–1 *et seq.* Moreover, the Association's diversion of water is conditioned upon its obtaining the approval of the State Water Policy Commission. *R. S.* 58:1–17; see *Jersey City v. State Water Policy Commission*, 118 *N. J. L.* 72, 74 (*E. & A.* 1936). Finally, its corporate charter gives the Association the privilege "to provide for utility services." Therefore, we conclude the Association is operating a water system "under privileges granted * * * by this State or by any political subdivision thereof."

The Board found the Association controls the operation of the water system, and, although there is persuasive evidence to support the petitioner's contention the Developer dominates the Association, in view of the result we reach it is unnecessary for us to disturb the Board's finding. The character and extent of the water use here by the Associa-

tion, plus the privileges granted, make the Association a public utility under *N. J. S. A.* 48:2–13 regardless of who dominates it. We think it is within the spirit and letter of the statute that the operators of water supply systems, constructed in real estate developments for the purpose of fulfilling assurances to purchasers of lots that water will be supplied, should be subject to the jurisdiction of the Board of Public Utility Commissioners. Supervision and control by the Board is the most effective method of providing home-owners in such developments with a safe and adequate supply of water at reasonable rates.

Appellants assert the Board's jurisdiction was defective because only one of the three Trustees of the water system was before the Board. The Board had before it the Association, the body which the appellants admit controls the water system. The jurisdictional question posed is whether the Association constitutes a "public utility" within the meaning of *N. J. S. A.* 48:2–13. The Trustees are not essential parties to the resolution of that issue. If the resolution of the issues remaining before the Board requires the joinder of all the Trustees (we express no opinion as to this need), they of course can be brought in for the purpose of the remaining proceedings.

The order of the Board is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.