**PUBLIC WATER SUPPLY
COMPANY, INC.**

v.

**DiPASQUALE, et al.**

**C.A. No. 01A–03–002.**

Superior Court of Delaware,
Sussex County.

Submitted: Oct. 15, 2001.
Decided; Jan. 15, 2002.

Jeremy W. Homer, Esquire, Parkowski
& Guerke, P.A., Dover, for appellant.

John A. Sergovic, Esquire, Sergovic, El-
lis & Shirey, P.A., Georgetown, for appel-
lee, Tunnell Companies, L.P.

GRAVES, J.

This case comes before the Court on
appeal from the Final Order and Decision
Upon Remand issued by the Environmen-

tal Appeals Board ("EAB") on February 9, 2001. In that decision, the EAB concluded that Appellee Tunnell Companies ("Tunnell") was not operating as a "water utility" at the Baywood Greens development ("Baywood") and upheld the order filed by the Secretary of the Department of Natural Resources and Environmental Control ("Secretary") which directed the issuance of requested water permits to Tunnell. The EAB's decision is reversed for the reasons stated herein.

## PROCEDURAL POSTURE

In 1996, Tunnell applied to the Delaware Department of Natural Resources and Environmental Control Division of Water Resources ("DNREC") for two potable water well permits, three irrigation water well permits, and two water·allocation permits associated with the development and operation of an 18–hole public golf course and a 726–lot mobile home park, known collectively as Baywood. Public Water Supply Company, Inc. ("PWSC"), objected to the issuance of the permits, claiming that PWSC is the appropriate source of water for the development since it is a public

utility that possesses the Certificate of Public Convenience and Necessity ("CPCN") for the area encompassing Baywood.[1]

A hearing officer for DNREC considered testimony presented by the parties and subsequently recommended that the Secretary approve the issuance of the permits. The hearing officer concluded that the case involved two issues: environmental concerns, as protected by DNREC, and legal issues under the CPCN statute. In response to the first, the hearing officer held that PWSC "offered no meaningful challenge" to the evidence offered by Tunnell that there would be no negative environmental effects if Tunnell supplied water to its tenants. In response to the latter, the hearing officer first distinguished the holding of *Eastern Shore Natural Gas Co. v. Delaware Public Service Commission*, Del.Supr., 637 A.2d 10 (1994) ("*Eastern Shore*"),[2] by noting the differences between the regulatory schemes established for gas and water, paying particular attention to the recent amendments to the regulatory authority of DNREC. The hearing officer held that Tunnell is not a "public

---

1. At the time the permits were issued, 7 *Del. C.* § 6076 set forth the circumstances under which a CPCN must be obtained by a water utility. It read, in pertinent part:

   No water utility shall begin the business of a water utility nor shall any water utility begin any extension of its business or operations without having first obtained from the Secretary a certificate that the present or future public convenience and necessity requires or will require the operation of such business or extension.

   7 *Del. C.* § 6076 was repealed July 1, 2001, and the reenacted, in slightly varied form, as 26 *Del. C.* § 203C. The legislature has transferred the authority to issue CPCNs to the Public Service Commission.

2. Prior to the Supreme Court's decision in *Eastern Shore*, the so-called "public use" standard, derived from *In Matter of Bayview Improvement Company and Its Status as a Public Utility*, PSC Docket No. 288 (1960), prevailed

when determining whether an entity was a public utility. Under the public use standard, the reviewing entity examined the status of the various customers, vis-à-vis the water company. That is, the water company would not be considered a public utility if it serviced only its own tenants and did not hold itself out as a supplier to any third party. The Supreme Court's decision in *Eastern Shore* involved the regulation of gas, a utility that is subject to federal regulation. After looking at the language of federal legislation and examining case law from other states, the Court expanded the "public use" test to the "public interest" test. That is, the Court held that "[t]he pivotal issue in the determination of a company's status as a public utility is whether the company's activities have a significant impact on the public interest the [regulatory agency] was designed to protect." *Eastern Shore*, 637 A.2d at 17.

utility" because the interests protected by DNREC were not threatened and that Tunnell need not possess a CPCN to supply water to the Baywood development. In addition, the hearing officer interpreted 7 *Del. C.* § 6077(b)(3)[3] as not prohibiting the issuance of the requested permits because the subsection applies only to "an existing development with existing water service," which Baywood was not as it remained under construction at the time of the permit request.

The Secretary concurred with the hearing officer's opinion and ordered the issuance of all permits at issue. PWSC appealed the issuance of the potable water permits[4] to the EAB, which upheld the Secretary's decision after a hearing. In its opinion, the EAB briefly summarized the evidence before it and concluded that the Secretary's decision was well reasoned and without legal error. *EAB Op.* of Jan. 6, 1998 ("*EAB I* ").

PWSC appealed the EAB's order to the Superior Court. Pursuant to a Memorandum Opinion issued November 23, 1998, the Court upheld the EAB's determinations. *PWSC v. Tulou,* Del.Super., C.A. No. 98A–02–005, Graves, J. (Nov. 23, 1998) ("*PWSC I* "). At the outset of its opinion, the Court noted that the primary issue involved on appeal was one of statutory construction. The Court held that the term "for public use" as used in 7 *Del. C.* § 6002(27) is ambiguous and that interpretation by the EAB was appropriate.

*PWSC I* at 12. The Court then questioned whether Tunnell's activities would have a significant impact on the public interest DNREC was designed to protect, specifically, whether the public's interest in obtaining safe drinking water was affected. *Id.* at 13. After analyzing the record before it, the Court applied the standard of review set forth in *Eastern Shore* and concluded "[h]ow the [EAB] reached its decision here is entirely reasonable and not clearly erroneous." *Id.* at 14. The Court also agreed with the EAB's affirmation of the hearing officer's opinion that 7 *Del. C.* § 6077(b)(3) was inapplicable because "[t]he project is not a recorded development since mobile home lots cannot be recorded developments. Furthermore, Tunnell is not a resident of the development." *PWSC I* at 15. The Court upheld the EAB's decision.

PWSC appealed the Superior Court's decision to the Supreme Court. The Supreme Court overruled its previous holding in *Eastern Shore* with respect to the standard of review to be employed by a court when reviewing an agency's determination of statutory construction. *PWSC v. DiPasquale,* Del.Supr., 735 A.2d 378, 382–83 (1999) ("*PWSC II* "). In so doing, the Court articulated:

> Statutory interpretation is ultimately the responsibility of the courts. A reviewing court may accord due weight, but not defer to an agency interpretation of a statute administered by it. A

---

**3.** The pertinent portion of 7 Del.C. § 6077(b)(3) reads:

(b) Following issuance of a certificate of public convenience and necessity to a water utility, the department shall not withhold a potable water well permit or require an applicant for a potable water well in an area served by a water utility to utilize the services of the utility, unless:

\*\*\*

(3) The applicant is a resident of a municipality, county water district or re-

corded development where public water is available.

7 Del. C. § 6077(b)(3).

**4.** The hearing officer determined that 7 *Del. C.* § 6077 applies only to potable well permits; consequently, irrigation or agricultural wells would be exempt from whatever limitations might apply to potable well permits. No one has challenged this finding and it has become a non-issue.

reviewing court will not defer to such an interpretation as correct merely because it is rational or not clearly erroneous. *Id.* (footnote omitted). The Court then reaffirmed the plenary standard of review for issues of statutory construction suggested by the language it utilized in the decision of *Stoltz Management Co. v. Consumers Affairs Board,* Del.Supr., 616 A.2d 1205, 1208 (1992).

While the Supreme Court overruled *Eastern Shore* with respect to the applicable standard of review, it reaffirmed its substantive holdings "as they may apply to the question of what constitutes the operation of a public utility under Delaware law." *PWSC II* at 383. The Court provided guidance for the Superior Court on remand, noting "we view the substantive rulings of this court in *Eastern Shore* as *viable notwithstanding a division of regulatory authority between DNREC and the [Public Service Commission ("PSC") ].*" *Id.* at 384 (emphasis supplied). In conclusion, the Court reviewed the relevant legislative history and concluded that "even though the General Assembly split the regulatory authority with respect to water between the PSC and DNREC, ... such authority should not be viewed as mutually exclusive." *Id.* The case was reversed and remanded to the Superior Court for further proceedings consistent with its holding.

On remand, the parties submitted briefs on various issues, some of which were raised in response to the Supreme Court's ruling. Reluctant to base a ruling on issues and theories not considered by the EAB, this Court further remanded the case back to the EAB. In its opinion, the Court outlined some of the issues presented by the parties and summarized the related arguments briefly.

Although this Court specifically noted that it did not consider another hearing necessary, the EAB conducted an additional evidentiary hearing. Tunnell presented the testimony of three live witnesses, all of whom testified that government agencies other than DNREC and the PSC regulate the quality of water provided to customers who receive water from a non-CPCN holding source. PWSC presented the testimony of two live witnesses, both of whom are employed by Tidewater Utilities.[5] Both of these witnesses testified that there have been problems with the quality of the water provided by Tidewater for which the PSC is the sole entity to which a consumer may report a complaint. In these situations, the water meets the required threshold standards for potable water but is still offensive to the customer for one reason or another (e.g., hardness of water, chlorine content of water exceeding the consumer's sensitivities). Furthermore, the witnesses testified that PSC, if displeased with Tidewater, has the power to penalize it and has done so in the past. Evidence presented at the second hearing before the EAB centered on the resources available to a customer unsatisfied with the quality of his water supply.

The EAB again upheld the Secretary's issuance of the permits requested by Tunnell. In upholding the Secretary's decision, the EAB again concluded that PWSC had supplied no evidence to suggest that the permits should be denied based upon environmental grounds. *EAB Op.* of Feb. 9, 2001 ("*EAB II* ") at 12. With respect to the larger issue of whether Tunnell's activities constitute those of a public utility, the EAB examined what it perceived to be the purpose of the various agencies charged with water regulation.

**5.** PWSC is a wholly owned subsidiary of Tidewater Utilities. EAB Trans. of Oct. 17, 2000 at 83.

The EAB concluded that Tunnell is not in the business of, nor starting the business of, selling water and that Tunnell's' provision of water to its tenants does not have a significant impact on the areas of public interest protected by the PSC. Specifically, the EAB concluded that there was no distinct rate to be regulated because the cost and quality of the service provided by Tunnell was not separable from its business of renting residential space. Furthermore, the EAB held that, despite "somewhat sparse" evidence of economic impact on the consumers involved, *EAB II* at 14, the residents of Baywood would be "protected from the threat of excessive and discriminatory rates for which the PSC was created to protect the public." *EAB II* at 18.

PWSC appealed the EAB's decision on remand to the Superior Court. Once again, the central issue for consideration is whether Tunnell is operating as a public utility.

## STATEMENT OF FACTS

The facts presented in this case have been summarized many times before. The Court adopts the statement of facts as articulated in *PWSC v. DiPasquale,* Del.Super., C.A. No. 98A–02–005, Graves, J., 2000 WL 303632 (Feb. 29, 2000) (*"PWSC III"*):

Tunnell is developing the Baywood project as a 726–lot mobile home community and an 18–hole golf course northeast of Millsboro in the Long Neck area of Sussex County, Delaware. During the initial hearing, Robert Tunnell, managing partner of Tunnell, testified to how the development would function and the water service would be structured with respect to tenants and the public. *See, generally,* Hr'g Officer Tr. at 66–106. Tunnell will retain ownership of the entire property. Tenants of the mobile home community will pay ground rent and provide their own housing units. Lot leases will be for twelve year terms, with the tenant holding the option to cancel or renew on a yearly basis. Tunnell would provide water under the lease agreement, in addition to other services such as roads, security, community maintenance and sewer facilities. There will be no individual charges for water, but lots will be metered for sewage system purposes, as the waste treatment system will be designed for a finite daily load. It is anticipated for the foreseeable future sewer services will be provided for a flat fee. If it becomes apparent in the future that the sewer system is becoming overloaded, charges for excess will be imposed, metering incoming water as a gauge of sewer usage. In addition, Tunnell did not rule out future charges for outside uses of water if over-consumption were to become a problem.

The golf course of the Baywood project will be open to the public, and will also offer memberships to residents and non-residents. Tunnell expects to lease the facilities to another entity for operation of the course. The public will have access to the water supply at the golf course via use of restroom and drinking water amenities as well as indirectly through the "snack bar" facility.

PWSC is a public utility regulated by the PSC, with its primary operations in the Oak Orchard area of Sussex County. It serves approximately 2,300 customers in its certificated area on both sides of Indian River Bay. Prior to Tunnell's purchase of the six parcels that comprise the land on which Baywood will be developed, PWSC extended an 8–10 inch water main to Long Neck Road near the project site, in anticipation of growth in the area. It is not disputed that, were PWSC to be given the opportunity to serve Baywood, PWSC would be economically advantaged. It is also suggested that PWSC's existing cus-

tomers could see some benefits from the broadened customer base that Baywood represents to the company.

PWSC currently has a small amount of capacity within its water system that, with connection to Baywood, could service approximately the first fifty residential units. Testimony below reveals that in order for PWSC to effectively serve Baywood as it is phased in, the company would have to install additional wells, similar in scope and likely similar in location to those proposed by Tunnell. The effect on the aquifer from the wells proposed by Tunnell is confined to the property on which Baywood will sit.

## ISSUES PRESENTED

The issues as presented were phrased in varying fashion by the parties in their briefs. PWSC initially outlined them as follows:

1. What is the applicable standard of review?

2. Does the subject water supply activity have a significant impact on the public interest the PSC was designed to protect, and therefore constitute the activity of a public utility?

These questions[6] will be addressed in turn after a brief summary of the parties respective arguments.

## DISCUSSION

At the outset, it is necessary, as well as interesting, to note that the statutory framework in place at the time of the lower proceedings has been amended, ef-

fective July 1, 2001. The authority for the issuance of a CPCN now lies within the discretion of the PSC and is codified at 26 *Del. C.* § 203C. All references herein are to the statutory provisions in effect at the time the permits were issued, unless otherwise stated.

PWSC appeals the decision of the EAB and argues that the EAB failed to follow the guidance of the Superior and Supreme Courts in determining whether Tunnell's actions constitute that of a water utility. PWSC argues that the appropriate standard of review is plenary and that the EAB employed circular logic when it concluded that Tunnell was not a public utility. PWSC contends that the physical size of the development at issue is a significant factor, if not the determinative consideration, when analyzing a company's public utility status. In support of this contention, PWSC cites case law from New Jersey, a state which the Delaware Supreme Court noted in *Eastern Shore* has a similar public utility regulating scheme. The weight of PWSC's argument that Tunnell is acting as a public utility is based upon the fact that the PSC regulates both rates *and* quality of service.

Tunnell argues that the EAB's decision was based on the law as outlined by the Superior and Supreme Courts. Further, Tunnell contends that the EAB's decision is replete with factual findings that are supported by substantial evidence which are entitled to deference from this Court. Tunnell argues that the EAB was correct in concluding that the size of the Baywood development is not a determinative factor

---

**6.** In later briefing, PWSC honed in on the specific points of contention between the parties as such:

1. Did the EAB properly apply the *Eastern Shore* test?

2. Is the size of the project the most important fact regarding whether the potential effects of water service to Baywood have a "significant" impact on the public interest?

3. Does the case turn on the interpretation of law or the EAB's factual findings?

4. Does the public utility status turn on whether there is a direct charge for the water provided?

5. Does 7 *Del. C.* § 6077(b) mandate issuance of the permits?

in the legal analysis and, more generally, that the EAB properly emphasized the lack of reliable evidence to support a conclusion that PWSC would be able to provide water to Tunnell's consumers at a cheaper rate. Lastly, Tunnell asserts that recent legislative amendments to the public utility statutory framework protect the issued permits.

## A. Standard of Review

■ I agree with PWSC that this Court should employ a plenary standard of review when considering the arguments presented by the parties. The issue before the Court remains the question with which this case has always been concerned: what constitutes a "water utility" under Titles 7 and 26 of the Delaware Code? As this Court stated in *PWSC I*, the language "for public use" in the definitions of a utility under 7 *Del. C.* § 6002(27) and 26 *Del. C.* § 102(8) is ambiguous and was appropriately subjected to interpretation by the agency below. *PWSC I* at 12. As before, the critical issue in this case is whether Tunnell's activities constitute a "public use" as contemplated by 7 *Del. C.* § 6077. In light of the Supreme Court's opinion reversing its previous holding in *Eastern Shore* with respect to the appropriate standard of review in statutory construction cases, plenary review is appropriate.

## B. Public Utility Status

■ I will consider whether Tunnell is acting as a public utility, discussing the issues raised by PWSC as they arise.

Under both Title 7 and Title 26, the definition of a "water utility" is "any person or entity operating within this State any water service, system, plant or equipment for public use." 7 *Del. C.* § 6002, 26 *Del. C.* § 102.[7] As this Court summarized in *PWSC III*, the Supreme Court advocated a two-part test for the determination of

whether an entity is a public utility when it considered this case on appeal. First, the deliberative body must look at whether the activities involve the "sale of a regulated commodity" to third parties. If the activities do involve the sale of a regulated commodity, the analysis shifts to establishing whether the sales are such that they affect the public interest in a significant manner.

With respect to the first prong of this test, clearly water is a "regulated commodity." However, the parties disagree as to whether Tunnell's provision of water to Baywood consumers constitutes a "sale." Tunnell argues that it is not in the "business" of selling water and that its provision of water to its tenants is incidental to its lease of the property. Tunnell points to the fact that its tenants will not be charged directly for their water use; rather, the cost of the water will be "bundled" with other costs of upkeep. In fact, Tunnell argues, its provision of water is actually a *cost* of doing business. On the other hand, PWSC argues that, regardless of the method chosen by Tunnell to recoup the expense of providing the water to its tenants, the fact remains Tunnell is relying on its tenants to pay for the expense. Indirect charging, PWSC argues, is charging nonetheless and constitutes a sale for the purpose of public utility analysis. Below, the EAB agreed with Tunnell and concluded that "Tunnell's provision of water to its tenants as part of a bundle of services is incidental to the business of renting lots and the use of its golf course. It is neither in the business of, nor starting the business of, selling water." *EAB II* at 20. I disagree with this legal conclusion for the reasons articulated below.

First, to engage in a sale does not require one to be in the exclusive business of providing that product to consumers at cost. Sale is defined by Black's Law Dic-

---

7. These citations are current.

tionary as "[t]he transfer of property ... for a price." *Black's Law Dictionary* 1337 (7th ed.1999). The situation before the Court satisfies the requirements of this definition. Tunnell provides water to its lease holders. In exchange, Tunnell receives a sum of money as rent. Individual water meters are located at each lot in Baywood. Tunnell representatives have acknowledged that additional costs that Tunnell must incur to provide the water to its tenants will be passed on to them through an increase in the charge for the bundle services. Accordingly, however "incidental" the sale of water is to Tunnell's overall business objective, it is a sale nonetheless. Tunnell is engaged in the sale of a regulated commodity to third parties. Tunnell's tenant are to be considered independent third parties for reasons discussed below, in connection with the second prong of the legal analysis.

The second prong of the test requires that such sale of the public commodity affect the public interest the regulating agencies are responsible for protecting. As this Court noted in *PWSC III*, both DNREC and PSC possess the power to certify utilities in circumstances constituting "public convenience and necessity." 7 *Del. C.* § 6076, 7 *Del. C.* § 6077(a), 26 *Del. C.* § 203A(a)(1). The PSC is directed to consider the "efficiency, sufficiency and adequacy" of the utility's service, 26 *Del. C.* § 308, and protect against unreasonable rates while ensuring a reasonable rate of return for the utility, 26 *Del. C.* § 309–311. DNREC's primary interest is in ensuring that the area subject to certification is elective on the part of the residents, developer, or appropriate governing body or that "sound and efficient water resource planning, allocation, regulation and management" will be advanced. 7 *Del. C.* § 6077(a).

The Department of Health and Social Services ("DHSS"), while not possessing authority to certify, does have specific regulatory and punitive control over the installation of adequate plumbing and water supply equipment. 16 *Del. C.* § 7909 (safe water supply), § 7911 (adequate water supply), § 7934 (penalties). It considers approval of private wells, even where public water exists. 16 *Del. C.* § 7931. Further, it has authority over all "public water suppliers" with respect to water quality, and has at its disposal administrative penalties to ensure compliance. 16 *Del. C.* § 122(3)(c)(1–6).

In light of this background, an analysis of the "public interest" at issue with respect to the overall regulation of potable water includes (a) environmental concerns (DNREC), (b) adequacy and sufficiency of water (DHSS), and (c) public health and rates charged for water (PSC). As the Supreme Court has suggested in *PWSC II*, one of the pivotal issues in this case "revolve[s] around determining whether the potentially regulated company's activities had a significant impact on the public interest that the Commission was designed to protect, preserving and promoting indispensable services while preventing inferior service with excessive and discriminatory rates." *PWSC v. DiPasquale*, 735 A.2d at 384 (citation omitted).

The EAB concluded, "the PSC's primary function is to regulate rates and its secondary function is to address secondary factors within the context of rate regulation." *EAB II* at 14. In accordance with this conclusion, the EAB focused its inquiry on the economic effects on the businesses and consumers involved. This emphasis seems inspired by 7 *Del. C.* § 6077 and not by equally applicable PSC regulations. *See* 26 *Del. C.* § 308 (authorizing the PSC to penalize public utilities for inadequate services, products).

■ This Court concludes that the EAB's review of the issues before it was

inadequate, in light of the emphasis both *PWSC II* and *PWSC III* placed on the multi-purpose regulatory power possessed by the PSC. The EAB's decision relies primarily, if not solely, on an examination of the rate structure involved in this case.[8] However, a proper analysis of the interests the PSC was designed to protect would focus not only on the potential and actual costs involved to all parties but would give similar weight to the regulation of quality and service as well.

Several unique features of the Baywood development lead to the conclusion that Tunnell's provision of water to its customers constitutes a sale of a regulated commodity that affects the public interest, as defined above, in a significant manner.

First, the size of the Baywood development at 726 lots, assuming average residency of three people per housing unit, reached a total of 2,178 residents. The raw number of 726, alone, is 38% of the current customer base of 1,900 which PWSC has within its "Oak Orchard system"—clearly, a number of customers worthy of attention. Additionally, the length of the lease term (twelve years) together with the permanency of the housing situation (as is commonly known, a mobile home is not nearly as mobile as its name would imply), paints the picture of tenants at the mercy of their landlord with respect to utility bills if there is no regulation by

the state as to rates.[9] Tidewater recently acquired PWSC; together their client base is around 15,000 customers. Bd. Trans. of Oct. 17, 2000 at 89. Any costs PWSC needs to incur to provide water to the large Baywood area would be distributed among this large base.

Tunnell cites several examples of large developments that have not been subject to PSC regulation. It has frequently been emphasized that a proper analysis of whether an entity is operating as a public utility must be evaluated on a case by case basis. It follows that precedent cannot demand an identical outcome in the case before the Court, but is limited to suggesting guidelines for the reviewing body. I find PWSC's citation of New Jersey case law particularly persuasive in this instance.

In *Eastern Shore*, the Supreme Court noted that New Jersey law and Delaware law utilize the term "public utility" similarly.[10] The Court favorably cited New Jersey case law regarding the interpretation of this phrase. New Jersey case law is again helpful in this instance. In *Lewandowski v. Brookwood Musconetcong River Property Owners' Association*, N.J.Supr., 37 N.J. 433, 181 A.2d 506, 513 (1962), the Supreme Court of New Jersey held that size and the quantity of natural resource diverted were crucial factors in determining whether the water supplier was acting as a public utility.[11] The subdivision map

8. The EAB's decision also ultimately concluded that Tunnell is not in the business of selling water and, therefore, it is not a public utility. This was inadequately addressed by the EAB as the Supreme Court specifically noted, as it subsequently overruled this Court's holding, in *PWSC II*, "The [Superior Court] found that where the company was not in the business of supplying water, the intent of the statute was met."

9. These factors all support the treatment of Tunnell's tenants as independent third parties.

10. Under New Jersey law, a "public utility" is defined as: "every individual, copartnership, association, corporation ... that now or hereafter may own, operate, manage or control ... any ... water ... system, plant or equipment for public use ...." NJSA § 48.2–13.

11. There are numerous points of distinction between this case and *Lewandowski*, most notably that the developer in that case was selling his lots to the general public. Nonetheless, this Court feels that this is a minor distinction considering the long twelve year lease terms Tunnell plans to require of its tenants.

at issue in *Lewandowski* consisted of 1,000 units, with somewhere between 350 and 400 individuals having already purchased lots from the defendant. The New Jersey court held:

> Whether a water system is operated 'for public use' depends upon [t]he character and extent of the use .... If a water supplier diverts significant quantities from the State's natural resources for the ultimate use of a broad group of consumers, the system is operating for public use; and the fact that the supplier is under no obligation to supply the water diverted by it to the general public or any portion thereof is immaterial....

*Id.*

Tunnell is correct in arguing that size has not been a determinative factor in public utility analysis in Delaware. However, developments of the size at issue simply must be treated with greater scrutiny. Sussex County is growing at an unprecedented rate [12] and the residents are entitled to reap the benefits of the regulatory framework Delaware has established for potable water. This is not a diversion from the past so much as it is an embracing of the case-by-case nature of the analysis that must be conducted when considering cases of this magnitude. Certainly, every development is different in what it offers its consumers and/or the general public at large.[13]

In light of the substantial number of consumers, large water quantities and the

interests in protecting tenants who have entered into a long-term binding lease, I find Tunnell's operations to affect the public interest in a significant fashion. Tunnell's actions constitute that of a public utility and the EAB's legal conclusions were erroneous.

Since Tunnell's actions are consistent with those of a public utility, it must acquire a CPCN before providing water service to its tenants.[14] It is undisputed that PWSC possesses a CPCN for the area encompassing Baywood and that two CPCNs may not be issued for one geographical area for the provision of water.

■ Tunnell argues that 7 *Del. C.* § 6077(e) [15] requires the issuance of the permits, because Tunnell was operating as a self supply mobile home park at the time House Bill 500 (together with Senate Amendments 3 and 4) was adopted in 2000. The relevant portion of the statute reads:

> Notwithstanding paragraphs (d)(2) and (3) above, following the issuance of a [CPCN] to a water utility, the Department shall not withhold a potable water well permit from any person seeking to dig or extend a well on ... the lands of any existing mobile home community, or an addition, modification, or extension of that mobile home community, which now self supplies potable water under existing permits in an area served by a water utility, nor shall it require that *the person* utilize the services of the utility.

---

**12.** According to the United States Census of 2000, Sussex County grew by .38.3% from 1999 to 2000. *See* United States Census of 2000, *available at* http: //quickfacts.census.gov/qfd/states/10/10005.html.

**13.** The "precedent" that gives the Court the most pause is the dealings involving the Sea Colony development, a project of enormous size as well. However, that case is distinguishable, as noted by PWSC, because the

owners voluntarily sought a CPCN after time. There was no dispute; an nonadversarial application for a CPCN may not serve as precedent for a contested matter before the Court.

**14.** This directive is now governed by 26 *Del. C.* § 203C.

**15.** This section is currently located at 7 *Del. C.* § 6075(b).

This reliance is misplaced. The conclusion that Tunnell is acting as a public utility precludes the applicability of 7 *Del. C.* § 6077(e). This exception applies specifically to a "person," as distinguished from a "public utility." This seems clear to the Court but, in the event the intent of the legislature was unclear, in July, 2001, a further clarification was issued when the statute was again amended (and adopted as 7 *Del. C.* § 6075(b)): "However, this subsection shall not authorize or require the issuance of a potable well permit that would enable a person or entity to act as a water utility without a duly issued [CPCN]."

The rights granted to PWSC under the Secretary's authority under 7 *Del. C.* § 6077 are exclusive in nature and Tunnell may not supply water to its tenants without violating this Court's holding.

Based on the foregoing, the decision of the EAB rendered on February 9, 2001, is reversed.

**IT IS SO ORDERED.**